**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**TOMMY EDWARD YOUNG, SR.,**

      **Movant,**

**v.**                    **Civil Action No. 2:13-cv-10108
(Criminal No. 2:09-cr-00223-01)**

**UNITED STATES OF AMERICA,**

      **Respondent.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

Pending before the Court is the Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 of Movant, Tommy Edward Young, Sr. (ECF No. 250). This matter is assigned to the Honorable Thomas E. Johnston, United States District Judge, and by standing order has been referred to the undersigned United States Magistrate Judge for the submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, the undersigned respectfully **RECOMMENDS** that Movant's Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 be **DENIED,** and this action be **DISMISSED, with prejudice,** and removed from the docket of the Court.

**I.**    **Relevant Factual and Procedural History**

Movant Tommy Edward Young, Sr. ("Young") is currently incarcerated at FCI Beckley, serving a sentence of 132 months imprisonment after having been convicted of various property crimes by a federal jury sitting in Charleston, West Virginia.

In September 2009, Young was invited to Charleston by the United States Attorney's Office to discuss Young's alleged involvement in the interstate transportation of stolen property. (ECF No. 276 at 78-79).[1]  Young was told that if he attended the meeting, the U.S. Attorney's Office would not implicate Young's wife in any alleged wrongdoing. (*Id.* at 48). Accordingly, Young and his local Clay County attorney, Mr. Wayne King, made the trip to Charleston. (*Id.* at 77). Once there, Assistant United States Attorney ("AUSA") Susan Robinson, her associate AUSA, and their investigators shared with Young and King evidence the investigators had collected that tended to implicate Young, his son Tommy Edward Young, Jr. ("Tommy, Jr."), and several other co-conspirators in the possession, transport, and sale of stolen equipment. AUSA Robinson offered to discuss a favorable plea agreement with Young if he wished to admit guilt before further investigation, indictment, and trial. Young indicated that he was willing to discuss a plea agreement with the Government, but only if the AUSA agreed in return not to pursue charges against Tommy, Jr. (*Id.* at 48-49, 78-80). When AUSA Robinson refused that condition, no further communications occurred between Young and the U.S. Attorney's Office. (*Id.* at 49, 80).

On October 1, 2009, Young and Tommy, Jr. were named as the sole defendants in a seven-count indictment, charging them with conspiracy to transport across state lines, receive, and possess stolen motor vehicles and goods; interstate transportation of stolen motor vehicles; and possession of stolen motor vehicles and goods. (ECF No. 1). Young was represented by Wayne King at the initial appearance on the indictment; however, in view of King's representation of Tommy, Jr. in a state court case involving the theft of a motor vehicle during the same period as the conspiracy alleged in the federal

---

[1]  *See United States v. Young*, 2:09-cr-00223-01, for referenced documents.

indictment, King was later disqualified as Young's counsel. (ECF No. 23). Thus, on November 6, 2009, Matthew Victor ("Victor"), a CJA panel attorney with approximately eighteen years' experience, was appointed to represent Young. (ECF No. 29, ECF No. 276 at 51-52). Tommy, Jr. was represented by another CJA panel attorney, Jane Moran.

On November 30, 2009, AUSA Robinson wrote a letter to Victor. (ECF No. 252). This correspondence is the key piece of documentary evidence forming the basis of Young's § 2255 motion. In the letter, Robinson provided Victor "with information regarding the United States current position on relevant conduct with respect to [Young] based upon facts known to the United States to date." (*Id.* at 4). AUSA Robinson calculated Young's sentencing guideline range, arriving at a "total offense level" of 28 and stated that '[a]ny proposed plea offered by the United States would include both a charge to Count One, 18 U.S.C. § 371 (conspiracy) and a substantive count." (*Id.*). Ms. Robinson also mentioned that the Government was investigating additional conduct by Young that under one statutory provision carried an actual sentence of ten years, and under another section could carry a mandatory minimum sentence of five years with a twenty-year maximum. She added that she was "not in a position at this time to offer a plea to your client regarding this uncharged conduct, but I am willing to discuss it further with you if your client expresses a serious intent to negotiate a plea in this matter. As always, as the investigation progresses, the facts and circumstances may change resulting in a change in the position of the United States regarding resolution of this matter." (*Id.* at 5). The parties never engaged in plea negotiations. (ECF No. 276 at 67-68).

On March 2, 2010, trial began against Young and Tommy, Jr. (ECF No. 122). On March 5, Young testified on his own behalf and steadfastly proclaimed his innocence of

all charges. (ECF No. 155 at 148-49). He claimed that the Government's witnesses had lied, and he vehemently denied having committed any of the acts that they described to the jury. On March 8, 2010, the jury found Young guilty on six counts of the indictment and not guilty on one count. Tommy, Jr. was found guilty on three counts, and not guilty on one count. (ECF No. 127 at 1-2).

Sentencing was scheduled on July 7, 2010 to allow the parties sufficient to time to lodge objections to the Presentence Report. (ECF No. 134). The sentencing date was continued on several occasions thereafter. Young filed multiple objections to the Presentence Report. He prefaced his specific objections with a general objection to all paragraphs of the Presentence Report that indicated his involvement in criminal conduct, reiterating "the position he took before trial" and "consistent with his testimony at trial" that he was innocent of the charges levied against him. (ECF No. 156 at 1). On March 23, 2011, Young was sentenced to 132 months of imprisonment to be followed by three years of supervised release. (ECF No. 209). Young appealed his conviction and sentence to the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit"), but he was denied relief on April 30, 2012. (ECF No. 244). On May 3, 2013, Young filed the present action to vacate, set aside, or correct a sentence under 28 U.S.C. § 2255.

## II.     <u>**Movant's Ground to Vacate, Set Aside, or Correct His Sentence**</u>

Young raises only one ground in support of his motion. He asserts that Victor provided ineffective assistance of counsel by failing to discuss with him the November 30, 2009 "plea offer" submitted by the United States. (ECF No. 250 at 4). Young contends that had the Government's plea terms been communicated to him, he would have accepted the terms and entered a plea of guilty. (ECF No. 252 at 2). For relief,

Young asks that his conviction be vacated, and the United States be ordered to offer him the original plea deal. (ECF No. 250 at 11).

### III.   <u>Standard Under 28 U.S.C. §2255 and Controlling Legal Principles</u>

A motion made pursuant to 28 U.S.C. § 2255 is a collateral attack on a conviction or sentence entered in a separate proceeding. *Wall v. Kholi*, 131 S.Ct. 1278, 1284-85, 179 L.Ed.2d. 252 (2011). To succeed on such a motion, the movant must prove that the conviction or sentence was imposed in violation of the laws or Constitution of the United States; or the court imposing the sentence lacked jurisdiction; or the sentence exceeded the maximum authorized by law; or the sentence was otherwise subject to collateral attack. 28 U.S.C. § 2255. Because a § 2255 motion seeks to deny, evade, or impeach a judgment, claims of error that have previously been raised and rejected on a direct appeal of the judgment may not be raised again in a § 2255 motion. *United States v. Harrison*, No. 96-7579, 1997 WL 499671, at *1 (4th Cir. Aug. 25, 1997) (citing *Boeckenhaupt v. United States*, 537 F.2d 1182, 1183 (4th Cir. 1976).

In this case, Young attacks his conviction and sentence on the ground that his Sixth Amendment right to the effective assistance of counsel was denied during plea negotiations. The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to the effective assistance of counsel during all critical stages of their criminal proceedings, *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which include the plea-bargaining process. *Lafler v. Cooper*, ----U.S----, 132 S.Ct. 1376, 1384, 182 L.Ed.2d 398 (2012) (internal quotation marks omitted). While assistance "which is ineffective in preserving fairness does not meet the constitutional mandate," *Id.* at 685-86, "defects in assistance that have no probable effect upon the trial's outcome do not establish a constitutional violation."

*Mickens v. Taylor,* 535 U.S. 162, 166, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2001).

In *Strickland*, the Supreme Court adopted a two-prong test for determining whether a criminal defendant received ineffective assistance of counsel. The defendant carries the burden of satisfying both prongs of the test by a preponderance of the evidence, and "a failure of proof on either prong ends the matter." *United States v. Roane,* 378 F.3d 382, 404 (4th Cir. 1994). First, the defendant must show that counsel's representation fell below an objective standard of reasonableness. When evaluating counsel's performance under the first prong of *Strickland,* "judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. As such, the "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* (internal quotation marks omitted). The inquiry under *Strickland* is "whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011) (internal quotations omitted). Moreover, the Court is "not at liberty to rely on hindsight to reconstruct the circumstances of counsel's conduct." *Winston v. Pearson*, 683 F.3d 489, 504 (4th Cir. 2012). Rather, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *Kimmelman v. Morrison*, 477 U.S. 365, 381, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986).

The second prong of the *Strickland* test requires the defendant to affirmatively establish prejudice; that is, "that there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. By "different," the Supreme Court explained, the defendant must show a reasonable likelihood "of a result more favorable" to him. *Id.* at 695. It is insufficient for the defendant "to show that the errors had some conceivable effect on the outcome of the proceeding," because "[v]irtually every act or omission of counsel would meet that test." *Id.* at 693. Rather, a "reasonable probability" that the result would have been more favorable requires "a probability sufficient to undermine confidence in the outcome" of the proceeding. *Id.* at 694.

As a general rule, "defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Missouri v. Frye,* ––– U.S. ––––, 132 S.Ct. 1399, 1408, 182 L.Ed.2d 379 (2012). It follows, then, that when considering *Strickland* in the context of plea negotiations, the failure of defense counsel to communicate a favorable plea offer to his client will usually fall below an objective standard of reasonableness. *Id.* Therefore, in this case, to establish the first prong of *Strickland*, Young must show that the November 30, 2009 letter from AUSA Robinson constituted a formal plea offer with terms and conditions favorable to Young, and that Victor failed to communicate the offer to him.

Under the second prong of *Strickland*, Young must demonstrate prejudice from losing the opportunity to accept the November 30, 2009 plea offer. Obviously, if a showing of prejudice under *Strickland* requires evidence of a more favorable outcome, Young must show a reasonable probability that he would have accepted the plea offer had he known about it. *Frye,* 132 S.Ct. at 1410. However, Young's evidentiary burden does not end there. As the Supreme Court emphasized in *Frye,* "a defendant has no right to be offered a plea, nor a federal right that the judge accept it." *Id.* (citations omitted).

Accordingly, "to complete a showing of *Strickland* prejudice," in addition to demonstrating that he would have accepted the plea offer, Young must also establish "that, if the prosecution had the discretion to cancel [the plea offer] or if the trial court had the discretion to refuse to accept it, there is a reasonable probability neither the prosecution nor the trial court would have prevented the offer from being accepted or implemented." *Id.* Simply put, Young must show a reasonable likelihood that, in the end, he would have received a more favorable sentence from the entered plea.

## IV.   <u>Discussion</u>

At the time Young filed his § 2255 motion, he also filed a "Declaration" under oath, to which he attached the November 30, 2009 letter from AUSA Robinson. (ECF No. 252 at 1-5). Smith described the letter as containing "the major terms and conditions of a plea bargain the United States was prepared to enter with me." (*Id.* at 2). Young swore that the first time he saw or heard about the November 30, 2009 letter (the "November Letter") was on March 7, 2013 when he was reviewing a copy of his file from Victor's office to determine if he had grounds for collateral relief from his conviction and judgment. (*Id.*). Young further claimed in the Declaration that had he been informed of the November Letter's plea offer, he "would have instructed Attorney Victor to accept the prosecutor's terms. I would have signed a plea agreement containing said terms and conditions, and would have entered a plea of guilty to this Court." (*Id.*).

Accordingly, the undersigned ordered Attorney Victor to respond to the claims stated by Young in his § 2255 motion, supporting memorandum, and Declaration. (ECF No. 258). On July 2, 2013, Victor filed an affidavit in response to Young's allegations. (ECF No. 262). Victor indicated that he no longer had a copy of the November Letter as he had provided the original to Young. Moreover, Victor had no independent

8

recollection of discussing the November Letter with Young. However, Victor stated that "as a matter of general practice, I always carefully review plea agreements with my clients and it would be impossible for me to fail to discuss with Mr. Young a possible plea resolution of his case." (*Id.* at 2). Victor also recalled that Young had vociferously proclaimed his innocence from the beginning of their relationship. (*Id.*). In light of the disputed facts and the need for a credibility determination, an evidentiary hearing was held on April 21, 2014. (ECF No. 276). The parties were given an opportunity to submit final memoranda upon review of the hearing transcript. (ECF Nos. 277, 278, 279).

Having thoroughly considered the record, the undersigned **FINDS** that the November Letter did not constitute a formal plea offer that Victor had a duty to communicate to Young. Nevertheless, the undersigned **FINDS** it more likely so than not so that Victor discussed the substance of the November Letter with Young. Thus, Young fails to establish the first prong of the *Strickland* test. The undersigned further **FINDS** that Young's testimony that he would have accepted the alleged plea offer is simply not credible given that the terms of the plea offer would have required Young to take a position contrary to the interests of his son. Therefore, Young also fails to establish the second prong of the *Strickland* test. For these reasons, the undersigned **RECOMMENDS** that Young's § 2255 motion be dismissed.

### A. *The November 30, 2009 Letter*

The first question for the Court to resolve is whether the November Letter is a formal plea offer as envisioned by the Supreme Court in *Missouri v. Frye.* Young contends that the only logical interpretation of the November Letter is that the AUSA was making a formal plea offer in regard to the charged conduct. (ECF No. 251 at 6). In support of that position, he highlights language in the letter that sets forth a sentencing

guideline range if he agreed to plead guilty to the conspiracy charge and one substantive charge, and a separate offer to discuss a plea for uncharged conduct "if your client expresses serious intent to negotiate a plea in this matter."  (*Id.* at 9).

The Government disagrees, arguing that the November Letter merely stated the Government's current position on Young's relevant conduct should he consider a plea to one or more of the pending charges. The November Letter also discussed the Government's ongoing investigation of Young, making it clear that the Government's position was fluid, and offering to initiate plea negotiations. (ECF No. 278 at 3-4). In the Government's view, the November Letter inquired of Young's interest in pursuing a plea, but did not extend a formal plea offer. Indeed no specific terms or conditions were expressed in the letter, except that Young would have to plead guilty to two counts, one of which would be Count One of the indictment, charging conspiracy in violation of 18 U.S.C. § 371.  (*Id.*).

Victor likewise testified at the evidentiary hearing that the November Letter was not a formal plea offer, but was what he called a "relevant conduct letter." (ECF No. 276 at 62). He described the November Letter as a "non-binding suggestion to the defendant how to resolve a criminal case ... [i]n that letter, the Government usually discusses, again, in a nonbinding way, the potential exposure of the defendant to the – to a guideline sentence." (*Id.*). Victor further testified that a formal plea agreement in the Southern District of West Virginia followed a standard format that included common provisions; such as, paragraphs setting out the crimes, resolutions, monetary penalties, cooperation, FOIA, and entirety of the plea. (*Id.* at 53). Instead, the November Letter was just a prediction about sentence range, not something Young could have signed and returned to the AUSA, and expected to have "entered a plea on." (*Id.* at 62-63).

According to Victor, no formal plea offer was ever made by the Government. Moreover, Young never expressed any interest in plea negotiations. (*Id.* at 66-68). Victor described Young as "contemptuous" of the Government's case and persistent in his innocence of any criminal misconduct. (*Id.* at 59).

In *Frye*, the Supreme Court provided little guidance on what characteristics distinguished a formal plea offer from similar communications between a prosecutor and defense attorney, stating only that "its terms and its processing" must be documented for subsequent clarity. *Frye*, 132 S.Ct. at 1409. Nevertheless, the Supreme Court earlier stated that plea agreements "are essentially contracts." *Puckett v. United States,* 556 U.S. 129, 137, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009). Thus, there would have to be a "sufficiently well-defined offer," so that if accepted, a fact-finder could readily ascertain the terms of the resulting plea agreement and apply them. *See Merzbacher v. Shearin,* 706 F.3d 356, 369 (4th Cir. 2013). Courts that have considered this issue seem to agree that a formal plea offer is comprised of concrete terms and provisions, rather than preliminary inquiries and negotiations. *See, e.g. Ramirez v. United States,* 751 F.3d 604, 608 (8th Cir. 2014) (Informal offer with no promises or assurances is not a formal plea offer); *Montgomery v. United States,* No. 3:07–CR–00036–CRS, 2013 WL 6196554, at *4 (W.D.Ky. Nov. 26, 2013) (Stating that the Supreme Court "clearly intended to distinguish 'offers' made during the course of preliminary negotiations from those made once negotiations have concluded. In other words ... there must at the very least be some basis for concluding that the alleged offer could have been accepted or rejected without further discussion or negotiation."); *Meschino v. United States,* No. 12-c-8519, 2013 WL 1707959, at *2 (N.D.Ill. Apr. 19, 2013) (Stating that a draft plea agreement is not a formal plea offer); *Barnes v. United*

*States,* Nos. 13 Civ. 1226(SAS), 09 CR 1053(SAS), 2013 WL 3357925, at *4 (S.D.N.Y. July 2, 2013) (Informal plea discussions that included general outlines of a plea agreement, eliminated a leadership enhancement and stated a Guidelines range based on a quantity of drugs did not constitute a formal plea agreement.).

Here, the November Letter simply does not rise to the level of a formal plea offer. The letter begins with equivocation, prefacing a guidelines calculation with the caveat that it is the Government's "current" position based on facts "known to date." (ECF No. 252 at 4). After completing the calculation, AUSA Robinson makes it clear that she is not yet offering a plea by stating "[a]ny proposed plea offer by the United States would include both a charge to Count One, 18 U.S.C. § 371 (conspiracy) and a substantive count." (*Id.*). She adds that Young is currently being investigated for additional conduct that could potentially result in charges against him under statutory provisions completely separate from those at issue in the indictment, and confirms her understanding that Victor may wish to have future plea discussions that encompass a resolution of all criminal matters against Young. No standard terms are included in the November Letter. No stipulation of facts is proposed. The substantive charge to which Young would enter a guilty plea is not even specified. The letter ends as it begins, with an admonition that, as the investigation progresses, the position of the United States is subject to change. Considering the lack of commitment evident in the letter, and the absence of commonly-included provisions, the November Letter can be seen as nothing more than a bare-bones conversation-starter.

Although the November Letter was not a formal plea offer, the evidence preponderates in favor of a finding that Victor discussed the letter with Young nonetheless. Victor testified that as of April 21, 2014, he had been a practicing attorney

for twenty-three years, devoting 95% of his time to criminal law. (ECF No. 276 at 51). Therefore, in November 2009, Victor had over eighteen years' experience working as a criminal defense attorney, much of that time spent in the federal court system. (*Id.* at 52). Victor testified that, throughout his career, as a matter of custom, habit, practice and routine, he always discussed plea-related communications with his clients, and to the best of his knowledge and recollection, had never failed to do so. (*Id.* at 53-54).

Specifically regarding Young, Victor testified that he met at his office with Young on several occasions after being appointed Young's counsel and before taking Young's case to trial. (ECF No. 276 at 58). Victor reviewed the November Letter, which he described as a "relevant conduct letter," (*Id.* at 62), and testified that he believed he would have discussed the letter with Young on December 5, 2009 when they had a long conference at his office. (*Id.* at 63-65). According to Victor:

> There is --- to say that somehow I forgot to discuss this resolution of the case is like saying that I forgot to wake up this morning. That is crazy … I cannot imagine that during my conference with Mr. Young, or conferences later on, that the idea of a plea or a resolution of the case offered by the Government would not have been discussed.

(*Id.* at 64-65). Victor admitted that he had no specific recollection of discussing the letter with Young, but reiterated that it was his practice "to always review every document that I get from the Government pursuant to pleas and anything that may resolve the case." (*Id.* at 66).

Victor emphasized that Young's case was "a big case;" long and complicated, involving numerous witnesses, and voluminous discovery and documents. (ECF No. 276 at 58, 64). Victor confirmed that he spoke with Young at length about the various charges against him and the strength of the Government's evidence. Victor recalled that Young vehemently denied any criminal misconduct and never displayed any interest in

negotiating a plea with the Government. (*Id.* at 59). Victor gave Young the same talk he gave to every client about a lawyer's ethical obligation to keep his client communications confidential, while at the same time, not allowing the client to testify at trial to a position contrary to what he had told the lawyer. (*Id.* at 59). Victor recalled that, from the outset, Young insisted on testifying at trial. For that reason, Victor went over with Young the consequences associated with testifying, including perjury charges, and a five-point change in the sentence level under the guidelines, which would likely result from a loss of the acceptance of responsibility reduction and a gain of two-points under *United States v. Dunnigan*. (*Id.* at 60-61). According to Victor, he "discussed every aspect of the guidelines the [he] could conceivably think of" with Young. (*Id.* at 69). He was particularly concerned about the *Dunnigan* obstruction enhancement, the juvenile aspect—since Young's son was involved in some of the alleged thefts when he was a juvenile, and the leader/organizer enhancement, and Victor expressed these concerns to Young. (*Id.*). Notwithstanding their conferences about the risks of trial, Young never acknowledged responsibility for any of the charged conduct and firmly believed he would not be convicted. (ECF No. 276 at 72-75).

On the other hand, Young testified that he met with Victor at his office a couple of times, although he was not positive of the number. Young explained that during this time period, his wife was receiving treatment for cervical cancer, and he was busy helping her get to her appointments. (ECF No. 276 at 9-10). Young stated that Victor never discussed with him the possibility of providing substantial assistance to the Government; the risk of being charged with perjury if he testified in his case; the federal sentencing guidelines; the possibility of a plea; or the possibility of a sentence between 51 and 71 months. (*Id.* at 11, 13). Young stated that basically Victor just told him that he

was "looking at ten years, [so] we might as well take our chance with the jury." (*Id.* at 11). Young denied being told anything about the Government's sentence calculation, or its interest in negotiations. Young claimed he never saw nor heard about the plea offer in the November Letter until well after his conviction.

Perhaps appreciating that his trial testimony created a factual stumbling block for his § 2255 motion, Young attempted to reconcile his vigorous proclamations of innocence before, during, and after trial with his current claim that he would have entered a guilty plea to two counts had the November offer been communicated to him. Young clarified at the evidentiary hearing that he took the position that he was not guilty because he felt he had no choice but to go to trial, explaining: "Well, because I was under indictment, why --- if I was going to trial, how could I go to trial and plead guilty? It just – it didn't make no sense to me. Either I pled guilty or I went to trial." (*Id.* at 17-18). He also testified, "Like I advised you – Mr. Victor advised me I didn't have no choice, I couldn't plead not – I couldn't plead guilty and get sentenced for all seven charges." (*Id.* at 38). He did not explain, however, why he insisted on testifying, apparently against the advice of his counsel, or why he maintained that he was completely innocent of **all** charges, when he now admits he was guilty of at least some of them.

Therefore, although Victor had no specific recollection of discussing the November Letter with Young, his testimony is far more believable than Young's testimony. Victor confirmed that his practice was to discuss with his clients every plea-related communication from the Government, which is consistent with the custom of most criminal defense attorneys. Considering that Victor was an eighteen-year, seasoned criminal defense attorney, knowledgeable about his duties and

responsibilities, and particularly concerned about Young's prolonged and complicated case, it is difficult to believe that he would not have mentioned the November Letter when he met with Young for a lengthy face-to-face conference on December 5, 2009, a mere six days after receiving the letter. Indeed, it seems implausible that Victor would not have mentioned, at the very least, that the Government was investigating new, unrelated charges against Young. It makes no sense for Victor to have discussed with AUSA Robinson the possibility of resolving "all conduct under investigation," and then not have alerted Young to the uncharged conduct, which carried long statutory sentences and was being used by the Government as leverage to initiate plea negotiations of the pending charges.

Equally far-fetched is Young's testimony that Victor told him ***nothing*** about the federal sentencing guidelines, the possibility of initiating plea negotiations, or the likelihood of perjury charges if he testified falsely at his trial. Moreover, Young's explanation for why he so stridently maintained his innocence of all charges, despite being guilty of at least some of them, teeters on the brink of preposterousness. Young's attempt to portray himself as an uneducated victim at the mercy of his uncommunicative attorney is particularly unavailing when considering the circumstances surrounding Young's crimes and his testimony at trial. The record demonstrates that Young is far from naïve, and is anything but a victim. Moreover the record strongly suggests that against the advice of his attorney, Young insisted on testifying, and on the stand, was adamant that he did not commit any of the crimes of which he was accused, because he was confident that he could persuade the jury of his innocence. (ECF No. 155 at 114-190).

Victor's testimony made it obvious that Young was also vociferous in expounding his innocence to Victor. Thus, Young was not truthful about his guilt even when dealing with his own attorney. He was not interested in plea negotiations after his initial meeting with AUSA Robinson, and was described as "disdainful" and "contemptuous" of the Government's case throughout discovery and trial. Young was convinced that he would succeed at obtaining an acquittal, and did not pay much attention to Victor's advice. Victor's testimony in this regard is supported by the trial transcript. (ECF No. 155 at 114-117). Just prior to Young's trial testimony, Victor advised the Court that his client had insisted "from the beginning of my representation of him" that he wanted to tell his side of the story. Victor explained that he has counseled his client about the pitfalls of testifying, including perjury charges and enhancements to the sentencing guidelines, but reassured the Court that he knew of no reason why "I should not put the defendant on the stand." (Id. at 114). Young then proceeded to testify after being instructed by the Court of the risks and of his right to remain silent. Considering Young's state of mind as reflected by this exchange, one can surmise that Young may simply not have listened to Victor when the November Letter was discussed.

Therefore, assuming for argument's sake that the November Letter did constitute a formal plea offer, Young fails to prove by a preponderance of the evidence that Victor's performance fell below an objective standard of reasonableness. For that reason, the undersigned **FINDS** that Young fails to establish the first prong of the *Strickland* test.

### B.    *Acceptance of the Plea*

While Young's failure to establish the first prong of *Strickland*, by itself, is fatal to his § 2255 motion, he is equally unable to establish the second prong of the *Strickland* test. To prove prejudice, Young must establish by a preponderance of the evidence that

he would have accepted the offer; that the prosecution would not have withdrawn it; and the court would have approved the plea agreement. However, it is evident from Young's testimony at the evidentiary hearing that he would not have accepted one of the basic terms contained in the November Letter, and certainly would not have entered into a plea agreement that took a position contrary to his son's interest. Therefore, Young is unable to establish prejudice.

During the evidentiary hearing, Young testified that he interpreted the November Letter as allowing him to plead guilty to two charges, and in exchange, the Government would drop five charges against him. He then would have been sentenced to 51 to 71 months imprisonment instead of the 132-month sentence he received. (ECF No. 276 at 14). Young indicated that he would have accepted the plea offer since it assured him a sentence that was six years less than what Victor estimated the sentence would be if Young lost at trial. (*Id.* at 15).

However, on cross-examination, Young's testimony began to unravel. The first snag involved the nature of the two counts to which Young would plead guilty. The November Letter required one of those counts to be the conspiracy charge. (ECF No. 252 at 4). Accordingly, the AUSA asked Young to name his co-conspirators. (ECF No. 276 at 21). Apparently not wanting to implicate Tommy, Jr., his sole co-defendant, Young stated, "Nobody that was on my case." (*Id.* at 21). When asked about two other individuals discussed in the body of the indictment, but not named as co-defendants, Young again denied conspiring with any individuals mentioned in the indictment. Ultimately, Young testified that he did not understand the November Letter to require him to plead guilty to the conspiracy count. He believed he could pick any two of the seven counts. (*Id.* at 41).

Count One of the Indictment alleged that Young and Tommy, Jr. conspired with each other, and with Dennis Marcum, Jr. and Jay L. Summerfield, named as co-conspirators but not co-defendants, to transport stolen property; receive, possess, conceal, store, and sell stolen property; receive, possess, conceal, store, and sell stolen motor vehicles; and remove, obliterate, tamper with, and alter identification numbers for motor vehicles. (ECF No. 2). Count One included detailed paragraphs setting forth the overt acts taken in furtherance of the conspiracy, identifying the motor vehicles stolen, transported, and sold by Young, Tommy, Jr., and the others. (*Id.*). The November Letter clearly required, as one of its only well-defined terms, that Young enter a guilty plea to Count One of the Indictment. Accordingly, the alleged plea offer, if accepted, obligated Young to admit that he and his son committed the acts alleged in Count One. Young plainly would not have agreed to that condition as demonstrated by his continued refusal at the evidentiary hearing to admit to the acts alleged in Count One. Even after his conviction on the conspiracy charge, when asked at the hearing, "Did you conspire with your son as alleged in the indictment to steal heavy machinery and equipment and move it across state lines?," Young stated, "No, I never – I never had him involved in what I was doing." (ECF No. 276 at 26). What's more, Young was still not ready to admit his involvement with Marcum and Summerfield, even though Summerfield and Marcum had been convicted of the conspiracy and testified against Young at his trial. (See ECF No. 153 at 191; ECF No. 154 at 225; ECF No. 276 at 26). Given Young's refusal to concede the basic elements of Count One at this juncture of the proceedings, Young is hard-pressed to show by a preponderance of the evidence that he would have accepted the terms of the November Letter when they were first communicated to Victor.

The second snag in Young's testimony involved the absence of Tommy, Jr. in the terms of the November Letter. Plea negotiations were first suggested by the Government in September 2009, before the grand jury was asked to return an indictment. Young agreed to consider entering a guilty plea in exchange for the Government's agreement not to prosecute Tommy, Jr. When AUSA Robinson refused that condition, plea negotiations terminated before they began. (ECF No. 276 at 48-49). Without a doubt, from Young's perspective, the continued prosecution of Tommy, Jr. was a deal-breaker to any plea agreement.

At the evidentiary hearing, Young initially acknowledged that he would not have accepted the November Letter, as written, because it lacked a provision benefitting Tommy, Jr., stating:

> Okay, this, this plea offer, if I would of discussed it, and if I would have tried to work something out, I would have tried to work something out for my son, too. I would have tried to make arrangements to get him a lesser charge or out of the case period, too, if I would known [sic] about this plea bargain, if I could have negotiated it. That would have been my note to go chasing things, to do something for my son, too.

(*Id.* at 25). Later, he added:

> I mean, it's not an agreement, I'm sorry --- a plea offer. And plus, like I said, it's open for further discussion, though. I mean, how do I know if I would have went back and told you that I would accept this plea, I would plead guilty to this or this or this, and then what would you do for my son? I don't know, I don't know what your answer would be."

(Id. at 28). When the Government's attorney asked Young again if he would have accepted the alleged plea offer as written in the November Letter, with no promises related to his son, Young testified:

> What I'm telling you is I would have had my attorney contact you guys and see if he could work anything out concerning my son. I mean, this --- you can always speculate, but what I'm saying is, I would have wanted some kind of deal with my son --- whatever kind of deal. But, see, I never had

that opportunity, because it was never offered to me.

(ECF No. 276 at 28-29). Obviously, negotiations and compromise are what Young had in mind at the evidentiary hearing—not agreement and acceptance. His testimony confirms as much. Young essentially conceded that the November Letter was not a formal plea offer that he realistically would have accepted in 2009. Instead, it was, at most, a starting point for further negotiations. The Government claims that Young was not interested in starting the negotiations, however, until after he received the 132-month sentence, while Young tries to convince the Court otherwise. The problem with Young's position is that, separate and apart from Victor, Young was given the opportunity to negotiate a plea in September 2009, and he rejected it. The Government's September offer to negotiate was never formally withdrawn, so Young knew he had the option of pursuing a plea agreement if he wanted to enter a guilty plea. The AUSA told him so, as did his first attorney, Wayne King. However, Young chose not to negotiate, because AUSA Robinson prosecuted Tommy, Jr., and that fact did not change throughout the pendency of the case.

In the end, Young testified at the evidentiary hearing that he would have accepted the offer in the November Letter even if no agreement was reached to help Tommy, Jr., and even if he was forced to testify against Tommy, Jr. at trial. (*Id.* at 29-30). However, Young's testimony in this regard is just not credible. "[I]t is entirely clear that to demonstrate a reasonable probability that he would have accepted a plea, a petitioner's testimony that he would have done so must be credible." *Merzbacher*, 706 F.3d at 366-67. Given Young's devotion to Tommy, Jr., coupled with Young's history of dishonesty, and in view of the other evidence of record, the undersigned disregards this testimony as improbable and unconvincing.

Thus, considering the record as a whole, including the credibility of the witnesses, the undersigned concludes that weight of the evidence supports a finding that Young would **not** have accepted a plea offer extended by the United States in keeping with the November Letter because any such offer (1) would have required Young to take a position contrary his son's interests; and (2) would not have included terms to benefit his son. Therefore, the undersigned **FINDS** that Young fails to establish the second prong of the *Strickland* test.

## V.     Proposal and Recommendations

Therefore, the undersigned **PROPOSES** that the presiding District Judge adopt the findings set forth herein, and respectfully **RECOMMENDS** that Movant's motion under 28 U.S.C. § 2255 be **DENIED**, (ECF No. 250), and that this civil action be **DISMISSED**, with prejudice, and **REMOVED** from the docket of the Court.[2]

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), Rule 8(b) of the Rules Governing Proceedings in the United States District Courts Under Section 2255 of Title 28, United States Code, and Rule 45(c) of the Federal Rules of Criminal Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service), from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

---

[2]  Young's Motion Requesting Expeditious Treatment, (ECF No. 265), is **DENIED**, as moot.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce,* 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, Judge Johnston, and Magistrate Judge Eifert.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to Movant and to counsel of record.

**FILED:** October 6, 2014.

Cheryl A. Eifert
United States Magistrate Judge